**PENNSYLVANIA MEDICAL SOCIETY, American Medical Association, Crawford County Medical Society, and Robert Moyers, M.D., Plaintiffs,**

v.

**William MARCONIS, M.D., Shirley F. Fox, R.N., James A. Kane, M.D., Guy L. Kratzner, M.D., Gary W. Lyons, M.D., Joshua A. Perper, M.D., Mark N. Richards, M.D., George N. Shelvin, Barbara K. Shore, Ph.D., Jason C. Shu, M.D., and Mary Ellen Weinberg, each individually and in their official capacities as members of the Pennsylvania State Board of Medicine, Defendants.**

**Civ. A. No. 90–193 Erie.**

United States District Court,
W.D. Pennsylvania.

Jan. 30, 1991.

---

Jack R. Bierig, Sidley & Austin, Chicago, Ill., Robert B. Hoffman, Reed Smith Shaw & McClay, Harrisburg, Pa., for plaintiffs.

Susan J. Forney, Sr. Atty. Gen., Harrisburg, Pa., John Gandrud, Erie, Pa., for defendants.

Gregory H. Knight, Harrisburg, Pa., amicus brief.

## MEMORANDUM OPINION

MENCER, District Judge.

By banning the practice of "balance billing," Pennsylvania limits the amount physicians may charge medicare recipients. Currently before this court is a declaratory judgment action challenging the Pennsylvania law under the supremacy clause of the United States Constitution. U.S. Const. Art. VI, cl. 2. Plaintiffs are three professional medical associations, Pennsylvania Medical Association (PMS), American Medical Association (AMA) and the Crawford County Medical Society (CCMS), and one doctor, Dr. Robert N. Moyers, M.D. (Moyers) (collectively The Societies). Defendants, sued in both their individual and official capacities, are the individual members of the Pennsylvania State Board of Medicine (collectively The Board); they are responsible for enforcing the Act against the members of PMS, AMA and CCMS including Dr. Moyers. See Stipulation of Facts ¶ 5 (Exhibit 2).[1] Both parties now

---

1. This court wishes to acknowledge and thank amici Donald English, Sarah Philyaw, Helena

move for summary judgment. For the reasons discussed below, defendants' motion will be granted.

## FACTUAL BACKGROUND

Medicare is the federal insurance program designed to pay for medical care of those 65 and older. 42 U.S.C. § 1395 et seq. It is composed of two main parts, Part A and Part B. Part A covers hospitalization and institutional charges, and it is not implicated in the current case. Part B establishes an insurance program to pay for doctors' services. 42 U.S.C. §§ 1395j–1395w–4. Benefits under Part B are administered by local insurance carriers under the supervision of the United States Department of Health and Human Services (HHS). 42 U.S.C. §§ 1395u.

Benefits are paid on a fee-for-service basis. However, the "fee" that medicare pays out is not necessarily the same as that which the doctor charges. Medicare has established a "reasonable charge" (MRC)[2] for each procedure, and although beneficiaries are covered for 80% of Part B costs,[3] Medicare pays out no more than 80% of the MRC regardless of what the doctor actually charges.

Physicians have two payment options under Part B. They can "accept assignment" which means that they bill Medicare directly and accept the MRC as full payment for their services. They receive 80% from Medicare and the 20% of the MRC from the patient. One advantage of "accepting assignment" is the guarantee of prompt payment from medicare. As their other option, physicians can charge "on the basis of an itemized bill." By this method the doctor can charge more than the MRC. Even if it is higher than the MRC, the Doctor bills the patient directly for her entire fee,

and the patient is responsible for 100% of doctor's bill while Medicare still only reimburses the patient for 80% of the MRC. 42 U.S.C. § 1395u(b)(3)(B). Billing in excess of the MRC is known as "balance billing."

Congress has established several mechanisms to encourage doctors to accept assignment rather than balance bill. The Deficit Reduction Act of 1984 (DEFRA) created the participating physicians program under which doctors may annually elect to accept assignment on all medicare patients for the coming year. Among other incentives, if they "participate" they can receive a 5% increase over the MRC. 42 U.S.C. § 1395u(b)(4)(A)(iv). DEFRA also froze charges for non-participating physicians. 42 U.S.C. § 1395u(j)(1); *Whitney v. Heckler*, 780 F.2d 963, 970–72 (11th Cir. 1986).

The Omnibus Budget Reconciliation Act of 1986 (OBRA 86) lifted the DEFRA freeze and substituted a system of "maximum allowable actual charges" (MAACs) as a new form of "price control for non-participating doctors." *AMA v. Bowen*, 857 F.2d 267, 268–69 (5th Cir.1988). MAACs place an across the board limit on the amount that non-participating doctors can charge (balance bill) medicare beneficiaries. 42 U.S.C. § 1395u(j)(1)(C). OBRA 86 also established the Physician Payment Review Commission (PPRC) as an advisory body to Congress. The PPRC is to submit annual recommendations for rates and methods of payment for physician's services under medicare part B. 42 U.S.C. § 1395w–1.

Based on PPRC reports, Congress set three additional constraints on balance billing in the Omnibus Budget Reconciliation Act of 1989 (OBRA 89). Congress protected the elderly poor by banning balance billing of those who are eligible for both

White and Action Alliance of Senior Citizens of Greater Philadelphia, and their counsel Community Legal Services of Philadelphia and Northwestern Legal Services of Erie, who filed a very helpful amicus brief on behalf of the defendants. We also acknowledge the amicus brief of The Pennsylvania Optometric Association on behalf of the plaintiffs, and we agree with them that plaintiffs have done an excellent job of presenting their case.

**2.** Medicare's reasonable charge (MRC) is the result of a complicated set of formulas found in the Medicare act, regulations and manuals. See 42 U.S.C. §§ 1395u(b)(3), 1395x(v); 42 CFR §§ 405.5029, 405.504; HHS, *Medicare Carriers Manual*, Part B, Ch. V (1987). Beginning in 1992, this system will be replaced by a national fee schedule. 42 U.S.C. § 1395w–4(a).

**3.** Beneficiaries are responsible for the remaining 20% as a co-payment.

medicare and medicaid. 42 U.S.C. § 1395w–4(g)(3). Congress also replaced MAACs with "limiting charges" (LCs). Beginning on January 1, 1991, non-participating physicians may balance bill up to the LC. For 1991, the LC is no more than 25% above the MRC, 20% in 1992 and 15% above in 1993 and beyond. 42 U.S.C. § 1395w–4(g)(1–2). Also, Congress lowered the MRCs for certain "overvalued procedures" and limited any balance billing to 125% of the lower MRC. 42 U.S.C. §§ 1395u(j)(1)(D); 1395u(b)(14)(A).

Against this backdrop of federal activity, Pennsylvania enacted the Pennsylvania Health Care Practitioners Medicare Fee Control Act, Pub.L. 1990–81, 35 P.S. § 449.31 et seq. (the Act), which makes it flatly unlawful to balance bill at all.[4] The plaintiffs claim that the Act is preempted by the sprawling Medicare legislation, while the defendants argue that the Act is of no concern or consequence to the federal scheme.

The parties agree that there are no factual disputes which a trial is needed to resolve, and thus resolution by summary judgment is particularly appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Chipollini v. Spencer Gifts*, 814 F.2d 893, 896 (3d Cir.1987).

## DISCUSSION

In deciding whether a federal law preempts a state law, our "sole task" is to discern Congressional intent. *California Fed. Savings & Loan v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Intent to preempt is found in three interrelated ways. *Schneidewind v. ANR Pipeline*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *Pokorny v. Ford*, 902 F.2d 1116, 1120 (3d Cir.1990). First, Congress may expressly preempt state law by so stating. No such express provision is present in the instant case. Second, courts will imply preemption where

Congress has "occupied the field" by extensive regulation. *Rice v. Santa Fe Elevator*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150. Preemption will also be found in a third situation: where there is "an actual conflict" between state and federal law. The presence of an actual conflict, though most often referring to situations where it would be physically impossible to comply with both laws, may also be found where the state law "stands as an obstacle to the accomplishment of and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Hillsborough County v. Automated Medical*, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

Under any approach, "we start with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). When Congress legislates within "the historic police powers of the States" plaintiff bears the heavy burden of proving that preemption "was the clear and manifest purpose of Congress." *Pacific Gas & Elec. v. Energy Resources Comm'n*, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152); *California v. ARC America*, 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989). The regulation of public health, and therefore medical care costs, is well within those historic police powers. *Hillsborough*, 471 U.S. at 707, 719, 105 S.Ct. at 2371, 2378; *Great Atlantic and Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 371, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976); *Massachusetts Nurses Association v. Dukakis*, 726 F.2d 41, 44 (1st Cir. 1984); *Rebaldo v. Cuomo*, 749 F.2d 133, 138 (2d Cir.1984). In fact, from its inception, the medicare program itself specifically sought to prevent any impact on the state's traditional role in the health care area. 42 U.S.C. §§ 1395; see 1395x(r)(1) (states define "physician"). Thus Congress

---

**4.** Balance billing is defined in § 3 of the Act as charging medicare patients more than the medi- care reasonable charge as determined by the Secretary of Health and Human Services.

has acted in a field which traditionally has been Pennsylvania's province, and the challenged law is constitutional unless plaintiffs prove that Congress has shown a clear intent to displace it. See *Rebaldo*, 749 F.2d at 138.

A similar if not identical law was challenged under a preemption theory in Massachusetts in 1985–86. That case was based only on the third type of preemption—that the state law stood as an obstacle to federal goals—and the First Circuit upheld the district court's judgment in favor of the defendants. *Massachusetts Medical Soc. v. Dukakis*, 815 F.2d 790, 791 (1st Cir.1987) (Breyer, J.). While the same challenge is made here, this case differs significantly from *Dukakis* because the landscape of federal regulation has changed dramatically since 1986. Although medicare was an extensive enterprise even then, absolutely none of the congressional attempts to regulate *balance billing* such as the MAACs, limiting charges, limitations on overvalued procedures and medicaid prohibitions, had been established. In fact, the PPRC had not even been created. This burgeoning federal regulation creates new issues regarding the state law as an obstacle under the "actual conflict" doctrine, and it is also the basis for plaintiff's first challenge which stems from the "occupation of the field" doctrine. We will address each proffered theory in turn.

## I. *Federal Occupation of the Field*

█ Federal legislation will occupy a particular field if it is "sufficiently comprehensive to make reasonable the inference that Congress has left no room for supplementary state regulation," *International Paper Co. v. Ouellette*, 479 U.S. 481, 491–92, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987); *Rice*, 331 U.S. at 230, 67 S.Ct. at

1152, or "where the federal interest in the field is sufficiently dominant." *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150. Plaintiffs suggest that the pervasive medicare scheme is of such character. We do not agree.

Preemption by occupation of the field is still a matter of congressional intent, *see Hillsborough*, 471 U.S. at 714, 105 S.Ct. at 2375, and thus the federal scheme must be so comprehensive that it supports an inference that Congress intends to oust state law. Comprehensiveness is only important to the extent its shows a desire for exclusivity, and thus comprehensiveness alone is insufficient to preempt. "[T]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *Hillsborough*, 471 U.S. at 717, 105 S.Ct. at 2377 (citation omitted).

Plaintiffs' argument here is no more than an elaborate description of just how comprehensive the federal scheme is, and thus, they fail to carry their burden. As elaborate as medicare may be, its mere existence does not clearly manifest an intent to displace state law. "Indeed, precisely because the regulatory scheme ... is so detailed, we [may just as logically] interpret the absence of clear preemptive language as indicative that Congress did not intend to displace state law entirely." *Ford Motor Co. v. Insurance Comm'r*, 874 F.2d 926, 939 (3d Cir.1989).[5]

Moreover, we find the absence of a preemptive provision particularly telling here. Although congressional silence is a notoriously bad barometer of congressional purpose, when Congress is aware of specif-

---

**5.** Plaintiffs contend that these parts of *Ford Motor Company* and *Hillsborough* are not apt because those cases dealt with preemption by agency regulation rather than congressional statute. We reject that assertion because those cases turn on the level of detail of the law and not on nature the promulgating authority. It would be ludicrous indeed to accord intricate agency regulation the power to preempt while denying that power to statutes of similar intrica-

cy. Plaintiffs can show only that where a statute lacks intricacy, the lack of explicit preemptive provisions sheds no light on congressional intent, whereas in any agency action the "relative ease" of including a preemptive provision makes its absence indicate a desire to leave state law alone. Where, as here, Congress manages to pass sprawling legislation itself more detailed than many agency regulations, the lack of a preemption provision is similarly conspicuous.

ic state laws and remains silent about them, the argument that Congress intended to displace them seems rather infirm. *Guerra*, 479 U.S. at 287–88, 107 S.Ct. at 692–693. This argument takes on considerably more force when Congress is not only *aware* of the general existence of various possibly inconsistent state laws, but *affirmatively considers* the interaction of specific state and federal laws and fails to preempt.[6]

The PPRC, Congress' own administrative body charged with making annual reports and recommendations, included an entire appendix to its 1989 report entitled "State Action to Constrain Balance Billing." PPRC, *1989 Annual Report to Congress*, 371 (at Amicus Brief at Exhibit A). In this appendix, the PPRC and therefore Congress, discusses the laws of Massachusetts, Rhode Island, Connecticut and Vermont. It notes eighteen other states where similar bills were considered, including Pennsylvania. Significantly, it also noted the legal challenge to the Massachusetts law. Additionally, the GAO issued an exhaustive forty-one page report surveying the costs and benefits of state balance billing practices. See United States General Accounting Office, *MEDICARE: Impact of State Mandatory Assignment Programs on Beneficiaries* (September 1989) (at plaintiffs' exhibit A). This report too, notes the First Circuit opinion upholding the Massachusetts law. *Id.* at 23. By so thoroughly analyzing the state-level reaction to medicare, it appears that Congress approves of a geographical fine tuning.[7] We need not

decide whether that actually was Congress' intent, however, because the Board prevails if plaintiffs fail to prove a "clear and manifest" congressional intent for the opposite.

Another way plaintiffs suggest that Congress has preempted state law is by operating in a field in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Pacific Gas*, 461 U.S. at 204, 103 S.Ct. at 1722; *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. Medicare reimbursement, plaintiffs continue, is "a subject that by is very nature admit[s] only of national supervision." *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). This court noted earlier, however, that regulation of health care (including cost containment) is a state function—it is emphatically not a uniquely federal subject.

If the Societies wish to stake out the "field" which Congress has occupied as the subcategory of "medicare reimbursement" or the further subcategory of "balance billing regulation," they must demonstrate an affirmative Congressional intent to carve out that niche from the state's province. *See Hillsborough*, 471 U.S. at 714–19, 105 S.Ct. at 2375–78; *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150. Congress, however, legislated around and with full knowledge of extant state laws, and we cannot find in that any desire to carve out a protected area for medicare reimbursement. Plaintiffs also argue that because the state targets medicare beneficiaries and provid-

---

**6.** We disagree strongly with plaintiff's claim that " '[t]here is no text here ... to which expressions of preemptive intent might attach.' " *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988). Statutory text fills pages upon pages and the PPRC requires entire books to house its reports. DEFRA, OBRA 86 and OBRA 89 provided extensive new medicare regulation and provided ample text to which preemptive expressions of intent may have attached. *Isla Petroleum* dealt with an entirely different matter: the preemptive effect of *absent* federal legislation.

**7.** Defendants point to a statement associated with the House Ways and Means Committee: "The Committee intends that nothing in this

section would prejudice the right of any State to require assignment on Medicare claims as a condition of licensure in the State." H.R. Report No. 247, 101st Cong., 1st Sess., p. 1008, U.S.Code Cong. & Admin.News 1989, 1906, 2479. This court, however, deems that statement to be insignificant for the purpose of judicial construction. We do not know whether this statement was approved by the committee or inserted by Congressional staff members to influence the judiciary. Abiding by such a statement gives it the force of law when the only thing we are certain of is that it was not approved by the entire Congress. See *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (Scalia, J., concurring).

ers, it is directed against the federal program and thus entitled to exacting scrutiny. *Schneidewind*, 485 U.S. at 308–09, 108 S.Ct. at 1154–55. We think that the state's taking advantage of a ready set of federal age and price categories instead of paying for calculating a redundant set of its own does not make the Act one which is "directed specifically against" the federal program, *Raskin v. Moran*, 684 F.2d 472, 477 n. 8 (7th Cir.1982); it simply makes it efficient.

In sum, not only was Congress aware of the state laws and the constitutional challenges to them, it affirmatively considered the effects of those laws in forming its own policy. Not only did Congress consider those laws in its own policy, it actually executed, in several different bills, an extensive new set of rules regarding balance billing without any hint of a desire to displace those laws. Thus the occupation of the field doctrine analysis does not present the "clear and manifest" purpose required to displace state law.

All these issues, of course, overlap with the questions of policy. Whether there is reason to preempt state law certainly impacts on our analysis of congressional intent. However, although they apply to part I, our policy-based analyses are more appropriately addressed in part II where we discuss the possible clashing objectives of the state and federal laws.

## II. *Obstacle to Federal Purpose*

'Actual conflict' preemption exists when compliance with both federal and state laws is physically impossible, *Florida Lime*, 373 U.S. at 142–43, 83 S.Ct. at 1217–18, or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1151; *Silkwood v. Kerr–McGee Corporation*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. Actual conflict analyses must be cautious and precise, however, "to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." *Northwest Central Pipeline v.*

*State Corp. Comm'n*, 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989). Preemption will be found "only where [state law] presents an actual, clear conflict with federal regulation." *Pokorny*, 902 F.2d at 1123.

The Societies see an actual conflict in two areas. First they claim that medicare has established a balance billing "option" which the Act unconstitutionality negates. Second, the Act allegedly conflicts with the requirement that doctors become participating physicians voluntarily. (Plaintiff's brief at 24).

### A. The "Option"

■ Plaintiffs argue that by giving physicians the choice to accept assignment or not, 42 U.S.C. § 1395u(b)(3)(B), Congress has created an inviolable right to balance bill which the states cannot destroy. Although this is precisely the argument rejected by the First Circuit in *Dukakis*, the regulatory landscape has changed enough to warrant a new inquiry. The result however is the same: state prohibition of balance billing does not interfere with the federal program.

If used as a conclusion, the term "option" is not very helpful. Plaintiffs, of course, have always had the *federal* "option" to balance bill. The issue is whether their "option" is impervious to state interference. One way to establish that type of option is to show that such was Congress' intent. *Dukakis*, 815 F.2d at 792. However, an intent to guarantee physicians an option to balance bill free from state interference is almost the same as a specific intent to preempt, and we have already found that lacking in Part I. An option can also be found whether or not Congress had a specific intent regarding preemption, if the state law obstructs the purposes which Congress *did* intend. In other words, we say that an option to balance bill is necessary to effectuate congressional purposes, or that its absence is an obstacle to that purpose. From this we may imply that Congress intended to preempt any state law that interferes with the option. See *Ouellette*, 479 U.S. at 494–95, 107 S.Ct. at 812–13.

The substance of the balance billing debate is the trade off between affordability and access. Eliminating balance billing, though increasing affordability, might decrease the total amount of physician's services available since fewer doctors will be willing to work for the limited fee, and beneficiaries will end up being able to afford only non-existent services. Plaintiffs contend that Congress purposefully allows balance billing as Medicare's "safety valve" to prevent all doctors from abandoning medicare patients, and to assure at least *some* access to medical care at any cost. The Societies claim that by creating "limiting charges" and MAACs and the other extensive regulation of balance billing in particular, Congress has defined for the nation the appropriate mix of cost containment and access. Since an integral part of that mix is the doctor's option to balance bill to the extent Congress allows, they continue, the Pennsylvania ban upsets a delicate compromise.

Showing a Congressional design to strike a particular balance, however, is not sufficient to shut states out of the process. The Societies must show a need or an intent that the particular balance of cost and access be *nationally uniform.* Whether it is wise to stop the federal government from closing all "safety valves" throughout the nation, is of course, an entirely different question from whether it is wise to prevent states from closing one safety valve where it would serve the local interest.

The "option" cases relied upon by the plaintiff all concerned a uniquely federal interest in the subject matter or a particular interest in national uniformity. See, e.g., *Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950) (armed services); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (U.S. bonds). *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) (national uniformity important under Railroad Retirement Act); *Lawrence County v. Lead–Deadwood Sch. Dist.,* 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985) (specific intent to bypass state government). Plain-

tiffs rely extensively on the Third Circuit's decision in *Pokorny,* but that decision also rested squarely on the importance of uniformity and on a clear congressional intent. *Pokorny* held that federal regulations allowing that certain automobile restraints were sufficiently safe preempted common law liability for failing to install other ones. Safety standards that varied from state to state would be unwieldy, and if allowed, one state's stringent laws could force auto makers to pay for safety features which all other states and Congress have determined are unnecessary. Thus, as the Third Circuit noted, national uniformity was a very important concern. *Id.* at 1122. Most important, however, was Congressional intent; the court found the federal safety standard was "specifically designed to give automobile manufacturers a choice among several options" which the states could not impair. *Pokorny,* 902 F.2d at 1123.

To show both the need and the intent for a protected option to balance bill, plaintiffs point to various legislators' remarks. Each of them, however, merely addresses the decision not to ban balance billing on the federal level. Representative Mills, the architect of Medicare explained that if a doctor charged $2,000 but in the area where the patient lives "$1,000 is the customary prevailing and reasonable fee against which we are indemnifying the patient, the doctor still makes the arrangement with his patient, or the patient makes it with his doctor to pay the difference." *Dukakis,* 815 F.2d at 792–93; 111 Cong.Rec. H7214 (Daily ed. April 7, 1965). Senator Kennedy stated that "[t]he fundamental compromise that permitted passage of Medicare in 1965 ... was the bargain ... [that] physicians would still be able to pursue additional private charges from their patient, free of Government restraint." 130 Cong.Rec. S5498 (Daily ed. May 9, 1984). Both of these remarks were addressed by the First Circuit. *Dukakis,* 815 F.2d at 793. In addition to these, plaintiffs offer the PPRC's comments regarding a proposal to ban balance billing at the federal level by requiring doctors to accept assignment:

[T]he Commission does not recommend mandatory assignment at this time.... Some provision for balance billing provides a "safety valve" for physicians who believe that the fee schedule does not adequately reflect the quality of services they provide. Without a safety valve, access to care could be reduced.

PPRC, *1989 Annual Report to Congress* 137. Moreover, the 1990 report stated that "[t]he Medicare Program has always allowed physicians to charge patients more than the approved Medicare payment amount ... [OBRA 89] continues that policy while placing clear and, in many cases, tighter limits on what physicians can charge." PPRC, *1990 Annual Report to Congress* 26.

As the First Circuit noted, the remarks of Congressmen Mills and Kennedy "show that the doctors' organizations that opposed the Medicare Act won a legislative victory by stopping a *federal* ban on balance billing. But, they do not show, nor does any history of the Act that we have found suggest, that these doctors won, in addition, a federal prohibition against *state* regulation of their fees. We think such a victory ... would have seemed significant and unusual enough to have warranted mention." *Id.* at 794. Not only do the added PPRC comments fail to support plaintiffs' contrary contention, they make the First Circuit's reasoning even more persuasive; the PPRC and Congress have been fully aware of pending or final legislation on balance billing in at least twenty-two states and Congressional desire to outlaw these surely "warranted mention."

There is also no particular "theoretical or logical" reason for national uniformity. *Dukakis*, 815 F.2d at 790. Unlike the armed forces or national bonds, there is no uniquely federal interest here. In fact, as we note time and again, the regulation of health care is a state function. Unlike *Pokorny*, where uniformity was important because regulations applied to a few companies who manufactured and distributed cars throughout the country, here each state could regulate the payments for services rendered within it without affecting any other doctors or patients or states.

Of course we perceive no threat of oppressive or unrestrained state regulation. In fact, "a state would likely be *more* cautious than the federal government, thinking twice before imposing such a ban, for a single state's ban on balance billing risks losing doctors to other states, while a federal ban does not." *Dukakis*, 815 F.2d at 795. Moreover, legislation at the state level is more politically responsive, and it offers the opportunity to "fine-tune" affordability and access balances by geographic and economic conditions, perhaps even down to the local level. Localized determinations promise greater accuracy since several of the obviously relevant factors such as the physician/population ratio and the cost of living vary significantly from state to state and locality to locality. Indeed, it appears that Congress gains a great deal of information and insight from the GAO and PPRC reports surveying state laws. Thus, there seems to be little to commend an abrupt halt to work of these "Brandeisean Laboratories," and that fact has not changed since *Dukakis* merely because Congress has enacted more legislation at the national level.

### B. Voluntariness

■ Finally, plaintiff claims that because Pennsylvania outlaws balance billing, a doctor's decision to accept assignment cannot be considered voluntary, and that conflicts with the express terms of 42 U.S.C. § 1395u(h)(1) which require that the decision to accept assignment be "voluntarily" made. Although suitably novel, we find no merit in this contention. We believe, that like all the other provisions addressed so far, this term refers to voluntariness from the *federal* perspective. The provision means that no federal law, specifically no other medicare provision, should coerce a physician into participation. It is similarly insignificant that Congress and Pennsylvania impose different penalties for charging over the MRC. Defendant's motion for summary judgment will therefore be granted by the accompanying order.

**1314**

## ORDER

AND NOW, this 30th day of January 1991, for the reasons set forth in the accompanying memorandum opinion,

IT IS HEREBY ORDERED THAT:

(1) The motion of plaintiffs PENNSYL-VANIA MEDICAL SOCIETY, AMERICAN MEDICAL ASSOCIATION, CRAWFORD COUNTY MEDICAL SOCIETY, and ROBERT MOYERS, M.D., for summary judgment is DENIED.

(2) The Motion of defendants WILLIAM MARCONIS, M.D., SHIRLEY F. FOX, R.N., JAMES A. KANE, M.D., GUY L. KRATZNER, M.D., GARY W. LYONS, M.D., JOSHUA A. PERPER, M.D., MARK N. RICHARDS, M.D., GEORGE N. SHELVIN, BARBARA K. SHORE, Ph.D., JASON C. SHU, M.D., AND MARY ELLEN WEINBERG, each individually and in their official capacities as members of the Pennsylvania State Board of Medicine, for summary judgment is GRANTED. Judgment is entered in favor of defendants WILLIAM MARCONIS, M.D., SHIRLEY F. FOX, R.N., JAMES A KANE, M.D., GUY L. KRATZNER, M.D., GARY W. LYONS, M.D., JOSHUA A. PERPER, M.D., MARK N. RICHARDS, M.D., GEORGE N. SHELVIN, BARBARA K. SHORE, Ph.D., JASON C. SHU, M.D., AND MARY ELLEN WEINBERG, each individually and in their official capacities as members of the Pennsylvania State Board of Medicine, and against plaintiffs PENNSYLVANIA MEDICAL SOCIETY, AMERICAN MEDICAL ASSOCIATION, CRAWFORD COUNTY MEDICAL SOCIETY, and ROBERT MOYERS, M.D.