85 F.3d 261
 65 USLW 2043, 51 Soc.Sec.Rep.Ser. 9,
Medicare & Medicaid Guide P 44,418
 Warren J. DOWNHOUR, D.O., Virginia Forney, Richard E. Shaw,
Warren D. Jacobs, Nino M. Camardese, M.D., George Lierenz,
Sam Giallombardo, Don Daugherty, Sara Presley and Hilda
Ruggles, Plaintiffs-Appellants,
v.
Peter SOMANI, M.D., individually and as Director of the Ohio
Department of Health, Defendant-Appellee.
 No. 94-4232.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 26, 1996.
Decided June 7, 1996.
 
 John B. Spitzer (briefed), Hummer Legal Services Corporation, Perrysburg, OH, Kent Masterson Brown (argued and briefed), and Christopher J. Shaughnessy, Brown, Kinkead & Bulleit, Lexington, KY, for Plaintiffs-Appellants.
 Dennis G. Nealon and Elise W. Porter (argued and briefed), Office of the Attorney General of Ohio, Columbus, OH, for Defendant-Appellee.
 Before: MARTIN, GUY, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The plaintiffs, two health care practitioners and several of their patients, filed an action seeking declaratory and injunctive relief to restrain the defendant from enforcing OHIO REV.CODE ANN. §§ 4769.01 & 4769.02, alleging, inter alia, that the statutes violate the Supremacy Clause, U.S. CONST. art. VI, cl. 2, because they are preempted by the Medicare Act, 42 U.S.C. §§ 1395-1395ccc. The complaint also contended that the statutes are void for vagueness, violate due process and equal protection guarantees, and infringe upon the constitutional right to privacy. The plaintiffs appeal from the district court's grant of summary judgment in favor of the defendant. Concluding that none of the plaintiffs' constitutional arguments has merit, we affirm.
 
 I.
 
 2
 In 1965, Congress enacted the "Federal Health Insurance for the Aged and Disabled" program, more commonly known as Medicare. 42 U.S.C. §§ 1395-1395ccc. Part A covers those services provided by institutions such as hospitals, 42 U.S.C. §§ 1395c-1395i-4; it is not implicated by this case. Part B provides supplemental medical insurance benefits for certain health care, including physician services. 42 U.S.C. §§ 1395j-1395w-4. Benefits under Part B are administered by private insurance carriers, who in turn are supervised by the Department of Health and Human Services. 42 U.S.C. § 1395u.
 
 
 3
 Under Medicare, a physician may choose to be a "participating" physician by "accepting assignments," meaning that the physician directly bills Medicare or, more precisely, the local Medicare insurance carrier for his services. If the claim is for a reimbursable, covered service, Medicare will pay 80% of what it has determined to be its approved rate, calculated pursuant to 42 U.S.C. § 1395w-4. The Medicare beneficiary is then responsible for a copayment of the remaining 20%. A participating physician agrees to accept the resulting 100% of the approved rate as full payment, even if it is less than his actual bill. See 42 U.S.C. § 1395l (a)(1).
 
 
 4
 In the alternative, a physician may choose not to accept assignments, which means he presents an itemized bill directly to a Medicare patient for his full charge. The patient applies in turn to Medicare, which will, as with participating physicians, reimburse 80% of its approved rate. Unlike in the case of a participating physician, however, the nonparticipating physician may then charge the patient for more than the 20% copayment, as Medicare provides that a nonparticipating physician is not prohibited from charging up to a total of 115% of the Medicare-approved rate. See 42 U.S.C. §§ 1395l (a)(1), 1395u(b)(3)(B)(i). The practice of charging the patient for more than 20% of the Medicare-approved rate is commonly referred to as balance billing, although this is not a term used in the Medicare statute. This 115% limit was an innovation of the Omnibus Budget Reconciliation Act of 1989, which provided that, beginning January 1, 1991, nonparticipating physicians could balance bill only up to a "limiting charge," which, for 1991, was 25% above the Medicare-determined allowable charge; for 1992, 20%; and for 1993 and thereafter, 15%. 42 U.S.C. § 1395w-4(g)(1)-(2).
 
 
 5
 On January 14, 1993, a group of statutes relating to the ability of health care practitioners to balance bill Medicare patients became effective in Ohio. The term "health care practitioner" includes "[a] physician authorized ... to practice medicine and surgery, osteopathic medicine and surgery, or podiatry," OHIO REV.CODE ANN. § 4769.01(C)(6) (Anderson 1994), and thus includes the plaintiff-physicians. Balance billing was originally defined as "charging or collecting an amount in excess of the amount reimbursable under the medicare program for medicare-covered services or supplies provided to a beneficiary of the program," OHIO REV.CODE ANN. § 4769.01(B) (Anderson 1994) (emphasis added). In the plaintiffs' view, this language imposed a requirement that a Medicare claim be filed whenever a service was performed, in order to determine what amount was "reimbursable" under Medicare. Also, as originally written, the statutes prohibited health care providers from balance billing only those Medicare patients whose family incomes were less than 600% of the poverty guidelines, but allowed balance billing of other, wealthier patients. OHIO REV.CODE ANN. § 4769.02 (Anderson 1994).
 
 
 6
 Effective November 24, 1995, however, the statute was amended, and now provides simply that "[n]o health care practitioner ... shall balance bill for any supplies or service provided to a medicare beneficiary." OHIO REV.CODE ANN. § 4769.02 (Supp.1995). Thus, the prohibition is no longer tied to the income level of the Medicare beneficiaries. Moreover, balance billing is now defined as "charging or collecting from a medicare beneficiary an amount in excess of the medicare reimbursement rate for medicare-covered services or supplies provided to a medicare beneficiary." OHIO REV.CODE ANN. § 4769.01(B) (Supp.1995). In other words, the statute now makes plain that it only applies once a Medicare claim has been filed, and that it imposes no independent requirement of filing a claim; if no claim is filed, the Ohio prohibition on balance billing simply is not activated. The statutory prohibition is enforced through complaints filed by those Medicare beneficiaries who believe they have been overcharged and who object to it; that is, there are no independent state investigations. Violations are punished by civil penalties. See generally OHIO REV.CODE ANN. §§ 4769.03-.10 (Supp.1995).
 
 
 7
 The plaintiffs filed suit challenging only OHIO REV.CODE ANN. §§ 4769.01-.02, which define and prohibit balance billing; the plaintiffs did not challenge the enforcement provisions of the statutory scheme. The first amended complaint alleged, inter alia, that the statutes were impliedly preempted by Medicare. In addition, the complaint alleged that the statute's original language, then in effect, providing for differential treatment of Medicare recipients based on their income was violative of the Equal Protection Clauses and the Due Process Clauses of the Fifth and Fourteenth Amendments. The plaintiffs further contended that the statutes were void for vagueness, because of the failure to define terms such as "family income." Finally, the plaintiffs asserted that the Ohio law required them to file Medicare claims in order to determine whether a claim was "reimbursable," and that this requirement violated their constitutional right to privacy; likewise, their constitutional right to privacy was violated by an implicit requirement that patients provide their personal financial information in order to determine whether they met the 600%-of-poverty-level threshold.
 
 
 8
 On the parties' cross-motions for summary judgment, the district court granted summary judgment in favor of the defendant, dismissing all of the plaintiffs' claims. The plaintiffs then filed this timely appeal.
 
 II.
 
 9
 When a district court's disposition of a case on cross-motions for summary judgment involves purely legal issues, this court's review is plenary. Schilz v. City of Taylor, 825 F.2d 944, 946 (6th Cir.1987).
 
 III.
 A.
 
 10
 At the heart of the plaintiffs' appeal is their argument that the Ohio statutes in question are preempted by Medicare. There has traditionally been a presumption against federal preemption of state law. Broyde v. Gotham Tower, Inc., 13 F.3d 994, 997 (6th Cir.) (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)), cert. denied, --- U.S. ----, 114 S.Ct. 2137, 128 L.Ed.2d 866 (1994); see New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., --- U.S. ----, ----, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995). There is, moreover, an additional and related judicial " 'assumption that the historic police powers of the States [are] not to be superseded by ... Federal [law] unless that was the clear and manifest purpose of Congress.' " Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154, 1161 (6th Cir.1993) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)); see New York State Conference, --- U.S. at ----, 115 S.Ct. at 1676. Accordingly, if the subject matter of the state statute is one within the state's traditional powers, the party arguing federal preemption must show that preemption was the "clear and manifest purpose of Congress." Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983).
 
 
 11
 As an initial matter, the parties disagree whether the Ohio statutes address a subject traditionally regulated by the states, thus requiring the plaintiffs to satisfy the high "clear and manifest purpose" standard. While public health care is indisputably such a traditionally regulated matter, see New York State Conference, --- U.S. at ---- - ----, 115 S.Ct. at 1676-77; Hillsborough County v. Automated Medical Lab., Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985), the plaintiffs suggest that the Ohio statutes regulate only medical costs, a subject that falls outside the purview of state police power. For support, the plaintiffs point to Judge Sloviter's dissent to Pennsylvania Medical Society v. Marconis, 942 F.2d 842, 858 (3d Cir.1991), in which the Third Circuit addressed the issues that confront us here and found no preemption. Judge Sloviter contended that while public health may be a matter within a state's police powers, medical billing is not, and thus a law banning balance billing is not entitled to any favorable presumptions. We disagree. The suggested distinction is interesting, but we think a health provider's billing practices are inextricably linked to public access to medical care--that is, public health. Regulation of public health presupposes and encompasses the regulation of the cost of medical care. The two issues are therefore really one, and are, together, within a state's police powers. Consequently, this court may not find that the Ohio statutes in question are preempted by Medicare unless, of course, it can be shown that preemption was the clear and manifest purpose of Congress.
 
 B.
 
 12
 A congressional enactment may preempt state law in three possible ways. First, the federal law may contain "an express congressional command" preempting state law. Cipollone, 505 U.S. at 516, 112 S.Ct. at 2617.
 
 
 13
 Second, state law may be impliedly preempted when the state law "actually conflicts with federal law," id., either because "it is impossible to comply with both state and federal law, or [because] the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal legislation," Marconis, 942 F.2d at 848. An actual conflict analysis should be narrow and precise, "to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." Northwest Cent. Pipeline Corp. v. State Corp. Comm'n, 489 U.S. 493, 515, 109 S.Ct. 1262, 1277, 103 L.Ed.2d 509 (1989).
 
 
 14
 Third, implied preemption also occurs when "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " Cipollone, 505 U.S. at 516, 112 S.Ct. at 2617 (citations omitted).
 
 
 15
 It is plain that Medicare contains no express preemption of state law, and the plaintiffs rely only on arguments of implied preemption.
 
 C.
 
 16
 The practice of "balance billing" was initially designed to benefit physicians who believed that the federal fee schedule did not adequately compensate them for the services they provided. See Medical Soc'y of State of New York v. State Dep't of Health, 83 N.Y.2d 447, 611 N.Y.S.2d 114, 115-16, 633 N.E.2d 468, 469-70 (1994). Over time, however, as the use of balance billing increased, along with a corresponding increase in out-of-pocket liabilities for Medicare beneficiaries, the practice has become controversial:
 
 
 17
 Opponents contend that many beneficiaries are victimized by the process because they are unaware of the insurance options and often do not know that their physicians "balance bill" until after services have been rendered. They also contend that balance billing thwarts Medicare's goal of reducing health care costs for beneficiaries because it invariably increases the amount charged to the beneficiary personally. Because this amount is generally not covered by other types of insurance, "extra bills become out-of-pocket liabilities" of the patient.
 
 
 18
 Medical Soc'y of State of New York v. Cuomo, 976 F.2d 812, 814 (2d Cir.1992) (citation omitted). In response to this mounting controversy, a number of states have considered banning the practice, and several have actually done so. Indeed, the laws banning or curtailing balance billing in three states--Massachusetts, Pennsylvania, and New York--have been challenged in federal courts on preemption grounds, and each has withstood the challenge. Cuomo, 976 F.2d 812 (New York law), aff'g 777 F.Supp. 1157 (S.D.N.Y.1991); Marconis, 942 F.2d 842 (Pennsylvania law), aff'g 755 F.Supp. 1305 (W.D.Pa.1991); Massachusetts Medical Soc'y v. Dukakis, 815 F.2d 790 (1st Cir.) (Massachusetts law), aff'g 637 F.Supp. 684 (D.Mass.1986), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). And not only have individual states been dismayed by the practice; Congress, too, "has repeatedly tried to discourage balance billing" through various legislative enactments. Cuomo, 976 F.2d at 814.
 
 
 19
 It is instructive to consider the language of the Medicare Act that the plaintiffs claim establishes the right of physicians to balance bill. The first such section provides that the Medicare insurance carrier
 
 
 20
 will take such action as may be necessary to assure that, where payment under this part for a service is on a charge basis, such charge will be reasonable and not higher than the charge applicable, for a comparable service and under comparable circumstances, to the policyholders and subscribers of the carrier, and such payment will ... be made--
 
 
 21
 (i) on the basis of an itemized bill; or
 
 
 22
 (ii) on the basis of an assignment....
 
 
 23
 42 U.S.C. § 1395u(b)(3)(B) (emphasis added). According to the plaintiffs, the "itemized bill" language reflects Congress's intention to allow balance billing. Likewise, they argue, since Congress has made plain throughout section 1395u that physicians may "voluntarily" elect to become participating physicians, e.g., 42 U.S.C. § 1395u(h), it follows that Congress intended not to require any physician to forego balance billing, since balance billing is the hallmark of the nonparticipating physician designation. In further support of their argument, the plaintiffs refer to the provision of the Act establishing the 115% limiting charge:
 
 
 24
 In the cases of a nonparticipating physician ...
 
 
 25
 [n]o person may bill or collect an actual charge for the service in excess of the limiting charge....
 
 
 26
 ....
 
 
 27
 For physicians' services furnished in a year after 1992, the "limiting charge" shall be 115 percent of the recognized payment amount under this part for nonparticipating physicians....
 
 
 28
 42 U.S.C. § 1395w-4(g)(1)(A)(i), (2)(C). The plaintiffs suggest that by forbidding balance billing beyond 115% of the Medicare-approved rate, Congress has created an affirmative entitlement for physicians to balance bill up to that amount.
 
 
 29
 We examine now, more closely, the plaintiffs' two implied preemption arguments.
 
 
 30
 (1) Actual Conflict
 
 
 31
 The plaintiffs' conclusion that Congress has created an inviolable right to balance bill that the states cannot destroy is based upon their argument that an option to balance bill is necessary to effectuate congressional purposes of maintaining a delicate balance between the competing objectives of providing beneficiaries with medical services they can afford and allowing access to physicians who charge higher fees. That argument has been made, and rejected, on several occasions in other courts. For example, in an opinion later affirmed by the Third Circuit, a district court in the Western District of Pennsylvania explained as follows:
 
 
 32
 Showing a Congressional design to strike a particular balance ... is not sufficient to shut states out of the process. The [plaintiffs] must show a need or an intent that the particular balance of cost and access be nationally uniform. Whether it is wise to stop the federal government from closing all "safety valves" throughout the nation, is of course, an entirely different question from whether it is wise to prevent states from closing one safety valve where it would serve the local interest.
 
 
 33
 Pennsylvania Medical Soc'y v. Marconis, 755 F.Supp. at 1312 (emphasis added). As the First Circuit observed in Dukakis, there is no particular "theoretical or logical" reason for national uniformity in this context; there is no uniquely federal interest in maintaining balance billing, and there is no concern, as there might be with, for example, transportation, that piecemeal state regulation will result in an unwieldy system. See Dukakis, 815 F.2d at 794-95. On the contrary, as the Dukakis court noted, there are compelling reasons for leaving the decision of whether to allow balance billing in the hands of the states:
 
 
 34
 After all, a state is ordinarily as concerned as the federal government to see that its elderly citizens enjoy medical care. A state would not normally wish to impose a ban that would hurt those citizens more than it helped them. Indeed, a state would likely be more cautious than the federal government, thinking twice before imposing such a ban, for a single state's ban on balance billing risks losing doctors to other states, while a federal ban does not. Moreover, to the extent that relevant economic conditions vary from state to state, an individual state may better be able to strike the balance between "affordability" and "access" in a way that best serves its older citizens.
 
 
 35
 Id. at 795; see also Marconis, 942 F.2d at 852-53.
 
 
 36
 As we have noted, a state law may "actually conflict" with a federal law either because it is impossible to comply with both, or because "the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal legislation." Marconis, 942 F.2d at 848. Because it is, obviously, possible to comply with both the federal and state law at issue here, the sole question is whether Ohio's law is an obstacle to Congress's objectives in enacting Medicare.
 
 
 37
 Part of the basis for the plaintiffs' theory that Congress has granted a "right" to balance bill that Ohio cannot deny is the argument that the Medicare Act, in providing that "[n]o person may bill or collect" more than 115% of the Medicare-allowed amount, has established a "right" to "bill or collect" up to that amount. We think not. Congress has not affirmatively stated that a health care practitioner is entitled to collect up to 115%, simply that he is forbidden from collecting more. That statement is certainly not equivalent to an express approval of charging 115%; even less is it a clear and manifest intention that such a "right" be preserved to the exclusion of contrary state laws. Moreover, as pointed out so well by other courts, there is no suggestion in the statute or legislative history that there is a need for national uniformity on the issue of balance billing, and there are, indeed, many persuasive reasons to conclude that state-specific legislation is preferable. In short, the plaintiffs' suggestion that Ohio's law is impliedly preempted because of an actual conflict with the Medicare Act must fail.
 
 
 38
 (2) Occupation of the Field
 
 
 39
 The plaintiffs have argued that Medicare's extensive and complex regulation of physician fees indicates an intent to occupy the field. We note, first, that it is well-established that comprehensiveness of a statutory scheme is important in the preemption analysis only to the extent it shows a desire for exclusivity; comprehensiveness, without a concomitant congressional indication of intention to preempt, is insufficient to preclude state law. Hillsborough County, 471 U.S. at 717, 105 S.Ct. at 2377. There is no indication in Medicare's balance billing provisions of a congressional desire for exclusivity; thus, the mere fact that Medicare is long and complicated is unimportant.
 
 
 40
 Second, the plaintiffs' claim is belied by Medicare's explicit statement of a lack of intention to occupy the field of compensation of health providers:
 
 
 41
 Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services....
 
 
 42
 42 U.S.C. § 1395. This statement, a fairly straightforward message by Congress conceding state sovereignty over the issue of regulation of physician fees, counsels strongly against the plaintiffs' claims. In fact, courts have described this language as an "unambiguous sentiment" presenting a serious impediment to any argument that Congress intended Medicare to occupy the balance-billing field. See, e.g., Cuomo, 976 F.2d at 818.
 
 
 43
 Finally, we note that Congress has long been aware of state bans on balance billing, yet it has never expressed an intent to preempt such bans. For example, Congress was unquestionably aware of state bans, and federal court decisions approving them, at the time it made extensive changes to Medicare in 1989. At that time, the Physician Payment Review Commission, an advisory body to Congress established by the Omnibus Budget Reconciliation Act of 1986, 42 U.S.C. § 1395w-1, submitted a report to Congress which included an appendix listing the four states that at the time had statutes restricting balance billing (Massachusetts, Rhode Island, Connecticut, and Vermont), as well as the additional eighteen states that had considered such statutes. PPRC, 1989 Annual Report to Congress 371 (cited in Marconis, 942 F.2d at 850). Moreover, the PPRC Report cited the First Circuit's 1987 Dukakis decision, in which the Massachusetts law banning balance billing was unsuccessfully challenged on preemption grounds. At the same time, the General Accounting Office issued a forty-one page report surveying the costs and benefits of state balance billing practices, which likewise referred to the First Circuit opinion. See GAO, MEDICARE: Impact of State Mandatory Assignment Programs on Beneficiaries (September 1989) (cited in Cuomo, 976 F.2d at 815).
 
 
 44
 On the one hand, we should "generally [be] reluctant to draw inferences from Congress' failure to act," Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306, 108 S.Ct. 1145, 1154, 99 L.Ed.2d 316 (1988), as "congressional silence provides [but] a squishy reed upon which to base congressional intent," Cuomo, 976 F.2d at 818. On the other, Congress's failure to explicitly preempt when it was so clearly aware of the backdrop of state regulation is more significant than the usual failure to act, a consideration that the Marconis court found highly persuasive:
 
 
 45
 The appellants cannot overcome the fact that, at the time of the Medicare amendments in 1989, and since then, Congress was and has been undisputedly aware of the fact that at least four states had balance billing restriction statutes and that similar restrictions had been considered by some 18 states.... This information was included in the PPRC report submitted to Congress in 1989. But in the face of this information, Congress did not include a specific preemption provision in the 1989 amendments to Medicare, nor has it done so since. The Supreme Court in a precedent we are not free to disregard has noted that when Congress remains silent regarding the preemptive effect of its legislation on state laws it knows to be in existence at the time of such legislation's passing, Congress has failed to evince the requisite clear and manifest purpose to supersede those state laws. Furthermore, in this case the silence is particularly indicative of congressional intent, given the extraordinary oversight of the Medicare program as evidenced by the very existence of the PPRC with its annual reports to Congress and by the frequent amendment of the Medicare Act. Congress has simply not preempted state balance billing restrictions.
 
 
 46
 Marconis, 942 F.2d at 850 (emphasis added) (citing California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 287-88, 107 S.Ct. 683, 692-93, 93 L.Ed.2d 613 (1987)). Like the Marconis court, in the peculiar context presented here, we find the congressional silence resounding.
 
 
 47
 In sum, we find the fact that Congress elected not to place a federal ban on balance billing carries little weight as an indication that it intended to displace state bans, under the special circumstances of Medicare legislation. Congress has long been aware that several states have banned balance billing, and that those bans have been upheld by the courts. In such circumstances, congressional silence, and the failure to explicitly preempt, becomes much more significant than it otherwise would be. Moreover, recognizing the considerable burden the plaintiffs face in advancing their claim, we conclude that there can be no serious debate that the plaintiffs have not shown a clear and manifest congressional purpose to occupy the field of balance billing.
 
 D.
 
 48
 Finally, we turn briefly to the remainder of the plaintiffs' claims, which are premised solely on language now abandoned by the statutory amendments enacted during the pendency of this appeal. We entertain considerable doubt as to whether those arguments have not been rendered moot, given that the plaintiffs are, after all, requesting only prospective injunctive relief, and given, further, that the Ohio Department of Health has issued an informational publication stating that it intends to follow the amended law in its implementation of the balance billing program. See generally Jones v. Temmer, 57 F.3d 921 (10th Cir.1995). At oral argument, however, the plaintiffs specifically declined to concede mootness, stating simply that the amendments had not led them to "necessarily forego" their remaining claims. Rather than address at length the complex mootness question, which has not been briefed, we will simply proceed to the merits.
 
 
 49
 As we have already described, beyond their preemption argument, the plaintiffs have contended that the Ohio statutes at issue are void for vagueness because of their failure to define various terms; that they are violative of due process and equal protection guarantees because they differentiate between groups of citizens based on income; and that they infringe upon the constitutional right to privacy both by requiring physicians to file a Medicare claim in order to determine if the particular claim was "reimbursable," and by requiring patients to provide their personal financial information in order to determine whether they meet the 600%-of-poverty-level threshold. These arguments, we conclude, are without merit.
 
 
 50
 First, the Ohio statutes, as previously written, more than adequately conveyed the applicable standard of conduct, and so were not impermissibly vague. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). Next, the previously existing differentiation between groups of Medicare recipients based on their income is a differentiation amply supported by the legitimate state interest of desiring to control medical costs for those least able to afford them. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Finally, the plaintiffs' right-to-privacy arguments fail on two grounds. One, our reading of the first version of the Ohio statute discloses no requirement that a Medicare claim be filed; any such requirement is imposed by the Medicare Act itself, not by the Ohio balance-billing ban. Two, the constitutional right to privacy does not extend to protect the plaintiffs' desire not to disclose their private financial information under these circumstances. See, e.g., Jarvis v. Wellman, 52 F.3d 125, 126 (6th Cir.1995); cf. Whalen v. Roe, 429 U.S. 589, 602, 97 S.Ct. 869, 877-78, 51 L.Ed.2d 64 (1977).
 
 IV.
 
 51
 AFFIRMED.