**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE MARYLAND PSYCHIATRIC SOCIETY,
INCORPORATED, a District Branch of
the American Psychiatric
Association,
Plaintiff-Appellee,

v.

MARTIN P. WASSERMAN, M.D., J.D.,
Secretary, Department of Health and                     No. 95-2767
Mental Hygiene of the State of
Maryland,
Defendant-Appellant,

and

DONNA E. SHALALA, SECRETARY OF
HEALTH AND HUMAN SERVICES,
Defendant.

THE MARYLAND PSYCHIATRIC SOCIETY,
INCORPORATED, a District Branch of
the American Psychiatric
Association,
Plaintiff-Appellee,

v.

DONNA E. SHALALA, SECRETARY OF
HEALTH AND HUMAN SERVICES,                    No. 95-2970
Defendant-Appellant,

and

MARTIN P. WASSERMAN, M.D., J.D.,
Secretary, Department of Health and
Mental Hygiene of the State of
Maryland,
Defendant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-95-894-S)

Argued: October 31, 1996

Decided: December 16, 1996

Before WILKINSON, Chief Judge, LUTTIG, Circuit Judge, and
BUTZNER, Senior Circuit Judge.

_____

Reversed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Luttig and Senior Judge Butzner joined.

_____

2

**COUNSEL**

**ARGUED:** Kathleen A. Morse, Assistant Attorney General, Baltimore, Maryland; Alisa Beth Klein, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Kathleen Howard Meredith, ILIFF & MEREDITH, P.C., Baltimore, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General, Baltimore, Maryland, for Appellant Wasserman; Frank W. Hunger, Assistant Attorney General, Lynne Ann Battaglia, United States Attorney, Barbara C. Biddle, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant Shalala.

_____

**OPINION**

WILKINSON, Chief Judge:

The Maryland Psychiatric Society, a professional association of psychiatrists, seeks injunctive and declaratory relief against Donna Shalala, Secretary of Health and Human Services, and Martin Wasserman, Secretary of the Maryland Department of Health and Mental Hygiene. The Society challenges the Secretaries' interpretation of the federal statutes governing payments for out-patient psychiatric services under a joint Medicare/Medicaid program called the Qualified Medicare Beneficiary ("QMB") Program. The district court agreed with the Society's interpretation and granted summary judgment in its favor. Because the district court's ruling imposes a financial burden on states which finds no basis in the relevant Medicare and Medicaid statutes, we reverse its judgment.

I.

The QMB program, thoroughly described in Rehabilitation Ass'n of Va., Inc. v. Kozlowski, 42 F.3d 1444 (4th Cir. 1994), is a hybrid of the Medicare and Medicaid programs. Individuals eligible for the program ("QMBs") have a certain percentage of their medical costs paid by Medicare (usually 80%). The remaining 20%, plus their annual premiums and annual deductibles, are paid by the state Medic-

aid program. The Medicaid statute forbids charges to the QMBs themselves over a nominal amount. 42 U.S.C. § 1396o.

Unlike most services where Medicare pays 80% of the full fee schedule amount, outpatient psychiatric services are only partially covered. Medicare coverage for these services is calculated by first excluding 37.5% from the fee schedule amount, and then paying 80% of the remaining 62.5%. 42 U.S.C. §§ 1395l(c), 1395l(a).

At issue in this case is who pays the excluded 37.5% for patients covered by the QMB program. The state of Maryland has paid the 20% of the 62.5% for QMBs under the state Medicaid program. The question of who pays the 37.5% exclusion, however, is not addressed in either the Medicaid or the Medicare statutes. Maryland's Secretary of Health and Mental Hygiene has taken the position that Maryland is not responsible for covering it. The United States supports this view. The Society argues on the other hand that the QMB statute requires the states to pay for the exclusion.

The District Court granted the Society's motion for summary judgment, ruling that the Society had the better view of the applicable statutory provisions. Secretaries Wasserman\* and Shalala both appealed.

_____

*Secretary Wasserman raises two preliminary challenges on this appeal. He first argues that the Society lacks standing to enforce the provisions of Medicare and Medicaid because the intended beneficiaries of these statutes are patients, not psychiatrists, physicians or providers. We ruled to the contrary in Rehabilitation Association of Virginia v. Kozlowski, 42 F.3d 1444, 1449 (4th Cir. 1994). Wasserman next contends that under Seminole Tribe of Florida v. Florida, 116 S.Ct. 1114 (1996), this court lacks jurisdiction to hear the Society's claim against him. He argues that because the Medicaid Act has a"comprehensive and detailed remedial scheme," Congress must have intended to foreclose suits designed to force state officials to comply with the terms of the Act. The Supreme Court rejected virtually identical arguments in Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498 (1990), ruling that the federal Secretary's "generalized powers" to audit and sanction noncompliant states "were insufficient to foreclose reliance on § 1983 to vindicate federal rights" in the Medicaid Act. Id. at 522.

II.

A state must agree to pay for "medicare cost-sharing" for QMBs in order to receive federal funds for its Medicaid program. 42 U.S.C. § 1396a(a)(10)(E)(i). The term "medicare cost-sharing" includes four specifically defined categories of costs that the state Medicaid program must pick up: premiums, coinsurance, deductibles, and the 20% left over after Medicare pays 80% for certain services. 42 U.S.C. § 1396d(p)(3). Nowhere do the QMB provisions mention Medicare's 37.5% exclusion for outpatient psychiatric services. The Society urges this court to find that the 37.5% exclusion is implicitly included in the "coinsurance" expenses that states are required to cover. 42 U.S.C. § 1396d(p)(3)(B). This we cannot do. Such a reading of "coinsurance" violates the boundaries of federal power set forth in Pennhurst v. Halderman, 451 U.S. 1 (1981), and finds no basis in the Medicare/Medicaid statutes.

A.

By virtue of its spending power, Congress is permitted to condition receipt of federal funds upon certain state actions. King v. Smith, 392 U.S. 309, 333 (1968). Such conditions, however, must be explicit and unambiguous, so that states understand the bargain they have made when they sign up for federal programs. Pennhurst, 451 U.S. at 17. Moreover, "in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." Id. at 17-18.

If Congress intended states to pay the 37.5% exclusion for outpatient psychiatric services for QMBs, it certainly did not say so explicitly, clearly, and unambiguously. The QMB provisions do not mention the exclusion at all. See 42 U.S.C.§ 1396a(a)(10)(E)(i); 42 U.S.C. § 1396d(p). While the Medicare statute allows non-QMB patients themselves to be charged the 37.5% excluded amount, 42 U.S.C. § 1395cc(a)(2)(A), nothing in the statute mentions who, if anyone, is required to pay the excluded amount for QMB patients. See 42 U.S.C. § 1395l(c).

The Society argues that states must cover the 37.5% exclusion because it is included in the QMB provision requiring states to pay

5

"[c]oinsurance under subchapter XVIII [the Medicare Act] (including coinsurance described in section 1395e of this title.)" 42 U.S.C. § 1396d(p)(3)(B). The district court so found by looking to Webster's Ninth New Collegiate Dictionary to illuminate Congress's intention for the word "coinsurance." The court found that coinsurance means "a shared obligation or `joint assumption of risk'" and that the 37.5% exclusion falls within this definition and should therefore be paid by the states for QMB patients.

The problem with adopting the district court's dictionary definition of coinsurance is that it sweeps in too much and renders other provisions of section 1396d(p)(3) superfluous. If the term coinsurance in section 1396d(p)(3)(B) were intended to include every payment obligation shared by the federal government and a state Medicaid program, then it would certainly encompass the 20% copayment required of states under the QMB program. If that were true, Congress would not have needed to include section 1396d(p)(3)(D), which requires the states to pay the 20% copayment for QMBs. Rules of statutory construction forbid us to construe one provision in a way that renders another provision of the same enactment superfluous. Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 877 (1991).

In all events, the general dictionary definition of coinsurance is too loose to support the imposition of substantial financial burdens on state governments. Instead, we read the word "coinsurance" to refer specifically to those expenses which Congress identified as "coinsurance" in the statutory sections that 1396d(p)(3)(B) references. Such a reading of the word "coinsurance" is consistent with the text and structure of the statute. Section 1396d(p)(3)(B) requires states to pay QMBs' "[c]oinsurance under subchapter XVIII[the Medicare Act] (including coinsurance described in section 1395e of this title.)" Section 1395e, describing cost-splitting for inpatient hospital services, explicitly uses the label "coinsurance" for certain identified costs not covered by Medicare. Similarly, when Congress added new provisions to the Medicare Act to cover prescription drugs in 1988, it expressly called certain of the noncovered amounts "coinsurance." See Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, Title III, § 202, 102 Stat. 683, 702 (since repealed).

The 37.5% exclusion for outpatient psychiatric services, however, is not labelled as "coinsurance" anywhere in the Medicare or Medic-

6

aid statutes. Unlike the 1988 prescription drug obligations, the 37.5% amount is not called coinsurance in the provision that excludes that amount from Medicare reimbursement, 42 U.S.C. § 1395*l*(c). Nor does section 1396d(p)(3)(B) explicitly cross-reference or include the 37.5% exclusion in its terms.

Because no provision in either the Medicare or Medicaid statutes explicitly and unambiguously requires states to cover the 37.5% exclusion, reading the QMB statute to mandate state coverage imposes a burden in violation of Pennhurst. As the Supreme Court has explained,

> The case for inferring intent is at its weakest where, as here, the rights asserted impose affirmative obligations on the States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial obligations on the States.

Pennhurst, 451 U.S. at 16-17. The states signed up to pay narrowly-defined categories of premiums, coinsurance, deductibles, and 20% of the incurred expenses for specific services. Nowhere did their contract with the federal government say that states would be required to cover amounts that were totally excluded from the Medicare calculation. Nowhere did their contract even suggest that the states must pick up 50% of the tab for any medical service (the 37.5% exclusion plus 20% of the remaining 62.5% equals 50% of total cost). Pennhurst does not permit the federal courts to connive in this sort of ambush of state treasuries. Redrafting the terms of understandings between the state and federal governments is little different from renegotiating contracts between private parties. Both are impermissible.

B.

The impropriety of imposing the 37.5% exclusion on states is underscored by several other factors. Among them is the fact that the federal Secretary of Health and Human Services, who is responsible for administering the QMB program, agrees that the states are not responsible for paying the 37.5%. It would take an extraordinary view of Pennhurst and Chevron v. Natural Resources, 467 U.S. 837

7

(1984), to fasten large financial obligations on the states in violation of the statutory interpretation of the federal implementing agency.

It is true that the Secretary espoused a contrary interpretation prior to 1992, and that her current interpretation of the statute may thus be entitled to less deference. See INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987). Even so, we find it to be significant that the federal Secretary and the state Secretary are in accord. If the state and federal governments both believe they agreed to the same terms in their QMB contract, courts should not casually change those terms and require the states to spend millions of additional dollars on psychiatric services.

The state's interpretation of the statute is also bolstered by the fact that the Society's arguments rest on a faulty assumption. The Society asserts that its member psychiatrists possess a statutory right to recover 100% of their reasonable charges in all circumstances, and that therefore some government entity, either state or federal, must pay the exclusion. See New York City Health & Hosps. Corp. v. Perales, 954 F.2d 854, 858 (2d Cir. 1992) (finding that Part B providers have an "express statutory right to recover their full reasonable costs or charges").

The Society's assumption has no basis in the statute. While 42 U.S.C. § 1395cc(a)(2)(A) authorizes providers to charge for the full amount of provided services, it does not guarantee full recovery. In Rehabilitation Association, this court declined to rest its judgment on a statutory right to 100% recovery for Medicare Part B providers, despite the fact that the district court had ruled on precisely that ground. Further, section 1395cc(a)(2)(A) applies only to "providers of services." "Providers of services" is a term of art which includes hospitals, nursing homes, clinics and similar organizations. It does not include physicians. 42 U.S.C. §§ 1395x(u), 1395cc(e). To the extent that the Society's case rests on the premise of a 100% recovery guarantee to plaintiffs in all circumstances based on the Medicare or Medicaid statutes, we find it flawed.

Finally, the state's interpretation of the statute complies with Congress' judgment that mental health services have a lesser claim than physical health services on scarce governmental resources. For most

8

outpatient physical health services, Congress has provided that Medicare will cover 80% of the reasonable cost. 42 U.S.C. § 1395*l*(a). By contrast, Medicare covers only 50% of outpatient mental health services (80% of 62.5%). 42 U.S.C. § 1395*l* (c). It would be ironic to conclude that when Congress designates a particular service for lesser funding it expects states to spend a greater percentage of their limited Medicaid funds on that disfavored service. As the Supreme Court has noted:

> Title XIX [Medicaid] was designed as a cooperative program of shared financial responsibility, not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund.

Harris v. McRae, 448 U.S. 297, 309 (1980). Congress could not have intended to leave the states holding the bag on every congressional exclusion. We certainly find no such obligation in the instant case.

III.

For the foregoing reasons, we reverse the judgment of the district court and remand this case with directions that it be dismissed.

REVERSED

9