159 F.3d 238
 58 Soc.Sec.Rep.Ser. 792
 ROYAL GEROPSYCHIATRIC SERVICES, INC.; Ohio Psychological
Association and newly certified class members,
Plaintiffs-Appellants,
v.
Arnold R. TOMPKINS, Director, Ohio Department of Human
Services; Ohio Department of Human Services;
Donna E. Shalala; United States
Department of Health and Human
Services,
Defendants-Appellees.
 No. 97-3146.
 United States Court of Appeals,
Sixth Circuit.
 Submitted July 30, 1998.
Decided Oct. 26, 1998.
 
 Howard A. Schulman (submitted), Schulman, Schulman & Meros, Cleveland, OH, Sheila P. Cooley (briefed), Cleveland, OH, for Plaintiffs-Appellants.
 Alan Schwepe (briefed), Office of Attorney General of Ohio, Health and Human Services Section, Columbus, OH, for Defendants-Appellees Arnold R. Tompkins and Ohio Department of Human Services.
 Barbara C. Biddle (submitted), Alisa B. Klein (briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Defendants-Appellees Donna E. Shalala and United States Department of Health and Human Services.
 Before: JONES, RYAN, and MOORE, Circuit Judges.
 RYAN, J., delivered the opinion of the court, in which NATHANIEL R. JONES, J., joined. MOORE, J. (pp. 245-246), delivered a separate concurring opinion.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Royal Geropsychiatric Services, Inc. (RGS) is a professional corporation composed of a group of psychiatrists specializing in the provision of psychiatric services to geriatric patients. Plaintiff Ohio Psychological Association (OPA) is a professional association for licensed psychologists in the State of Ohio. RGS and OPA filed a class-action complaint against federal and state defendants, requesting declaratory and injunctive relief in connection with a new policy adopted by defendant Department of Health and Human Services, and implemented by defendant Ohio Department of Human Services. The policy effectively reduced reimbursement to physicians and psychologists in connection with non-hospital treatment of indigent, mentally ill, elderly patients. The district court granted summary judgment to the defendants, and the plaintiffs appeal, contending this was error.
 
 
 2
 We must decide whether the district court correctly concluded that Ohio was not obligated under the Medicaid program to cover 37.5% of the Medicare-approved rate for outpatient mental-health services to the elderly poor. We conclude that the district court was correct and we shall affirm.
 
 I.
 
 3
 In 1965, Congress enacted the "Federal Health Insurance for the Aged and Disabled" program, more commonly known as the Medicare program. 42 U.S.C. §§ 1395-1395ccc. Part A of the Medicare program covers services provided by institutions such as hospitals, 42 U.S.C. §§ 1395c-1395i-4; Part B provides supplemental medical insurance benefits for certain health care, and is a voluntary program funded partly through premiums paid by beneficiaries, 42 U.S.C. §§ 1395j-1395w-4. This case concerns Part B benefits only. HHS administers Part B of the Medicare program through the Health Care Financing Administration, or HCFA.
 
 
 4
 In contrast to the Medicare program, the Medicaid program "was established in 1965 as a venture in 'cooperative federalism,' to 'provid[e] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons.' States that choose to participate in Medicaid are subject to the statutory terms of the program and the regulations promulgated by the Secretary of HHS." Douglas v. Babcock, 990 F.2d 875, 878 (6th Cir.1993) (quoting Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). Ohio participates in the Medicaid program. See OHIO REV.CODE ANN. § 5111.01.
 
 
 5
 We are concerned in this case with the overlap between Medicare and Medicaid, that is, health-care coverage for the elderly poor. Medicaid-participating states are required to enroll certain individuals in Medicare Part B by using Medicaid funds to pay Part B premiums. Thus, under the Medicaid program, 42 U.S.C. § 1396a(a)(10)(E)(i), a participating state is required to make medical assistance available to various categories of people for the purpose of "medicare cost-sharing." The particular category at issue in this case is that of qualified Medicare beneficiaries, or QMBs, under 42 U.S.C. § 1396d(p)(1). The term "cost-sharing" is discussed in greater depth below.
 
 
 6
 Under 42 U.S.C. § 1395l (a)(1), Medicare Part B typically pays a physician 80% of what the federal government designates as the approved rate, or "reasonable charge." 42 U.S.C. § 1395l (a)(1). A physician who elects to participate in Medicare agrees to "take assignment," that is, to accept the Medicare-approved rate as payment in full for his services, even if that rate is less than his actual bill. See 42 U.S.C. §§ 1395l (a)(1), 1395u(h). The same is true for Medicaid; a participating physician generally must accept a state's payment for services covered under the plan as payment in full. See id. § 1396o. But while a straight Medicare beneficiary is responsible for the remaining 20% of the physician's approved rate that is not covered by Medicare, a QMB has that amount paid by the state.
 
 
 7
 However, while Medicare pays 80% of the full approved rate for most services, outpatient psychiatric services are covered at a lower percentage. The statutory subsection on that subject, which is central to this case, is 42 U.S.C. § 1395l (c):
 
 
 8
 (c) Mental disordersNotwithstanding any other provision of this part, with respect to expenses incurred in any calendar year in connection with the treatment of mental, psychoneurotic, and personality disorders of an individual who is not an inpatient of a hospital at the time such expenses are incurred, there shall be considered as incurred expenses for purposes of subsections (a) and (b) of this section only 62 1/2 percent of such expenses.
 
 
 9
 Id. § 1395l(c) (emphasis added). In other words, this statute limits Medicare's responsibility to a total of 50% of the approved rate for outpatient treatment of mental disorders in a QMB, that is, 80% of the 62.5% that the statute deems it shall recognize as an incurred expense.
 
 
 10
 Usually, in the case of patients who are not QMBs, a physician may charge the patient the remaining 50% of the approved rate for section 1395. However, in the case of QMBs, there is a serious question, which gave rise to this lawsuit, about who is responsible for the remaining 50%. The state acknowledges responsibility for 12.5%, that is, 20% of the 62.5%, making the pertinent question here: who pays the remaining 37.5%? The plaintiffs say the state must pay it; the defendants say the plaintiffs must absorb it, meaning, in effect, that physicians can recover only 62.5% of their reasonable charge when they treat a QMB.
 
 
 11
 The Medicaid program, 42 U.S.C. § 1396a(a)(10)(E)(i), requires participating states to pay only certain Medicare obligations of QMBs, in particular, those listed in 42 U.S.C. § 1396d(p)(3). The parties' positions in this dispute center on their interpretations of § 1396d(p)(3), which defines the term "medicare cost-sharing," for purposes of the QMB program, as any of four specifically defined categories of costs that the state Medicaid program must cover--premiums, coinsurance, deductibles, and the 20% left after Medicare pays 80%. The paragraphs addressing coinsurance and the 20%--subparagraphs (B) and (D)--are the focus in this case:
 
 
 12
 The term "medicare cost-sharing" means ... the following costs incurred with respect to a qualified medicare beneficiary, without regard to whether the costs incurred were for items and services for which medical assistance is otherwise available under the plan:
 
 
 13
 (A)(i) premiums under section 1395i-2 or 1395i-2a of this title, and (ii) premiums under section 1395r of this title[.]
 
 
 14
 (B) Coinsurance under subchapter XVIII of this chapter (including coinsurance described in section 1395e of this title).
 
 
 15
 (C) Deductibles established under subchapter XVIII of this chapter (including those described in section 1395e and section 1395l (b) of this title).
 
 
 16
 (D) The difference between the amount that is paid under section 1395l(a) of this title and the amount that would be paid under such section if any reference to "80 percent" therein were deemed a reference to "100 percent."
 
 
 17
 42 U.S.C. § 1396d(p)(3) (emphasis added). It is the plaintiffs' position that the unpaid 37.5% is "coinsurance," and therefore that the 37.5% is the responsibility of the state pursuant to (p)(3)(B); it is the defendants' position that (p)(3)(D) controls, and that the state is therefore responsible only for the 20% copayment.
 
 
 18
 Between 1989 and June 1992, HHS treated the 37.5% as "coinsurance," and required that it be paid in full by the states. Since 1992, however, the HHS has taken the position that this 37.5% amount is not "coinsurance," and therefore that participating states need not pay this amount on behalf of QMBs. The Secretary concluded that although the 37.5% is similar to coinsurance, in that it is an amount that Medicare does not pay and that a regular Medicare beneficiary may be charged, it is nonetheless not coinsurance within the meaning of (p)(3)(B):
 
 
 19
 The specific concern is whether the 37 and 1/2 percent remainder, which is excluded from the Medicare incurred amount in determining Medicare's payment, is a coinsurance under Medicare which States are required to pay towards as Medicare cost-sharing for Qualified Medicare Beneficiaries (QMBs).
 
 
 20
 ....
 
 
 21
 In a prior decision on this issue, HCFA took the position that the 37 and 1/2 percent of the reasonable charge remaining after the reduction was applied was a coinsurance amount. Although HCFA recognized that this amount was not normally called coinsurance in Medicare issuances, it found that it was similar to coinsurance in that it is an amount which Medicare does not pay and which a provider may collect from the beneficiary.
 
 
 22
 ....
 
 
 23
 Although ... the [Medicare] Act authorizes participating providers to charge the beneficiary for the 37 and 1/2 percent that Medicare does not consider incurred, it does not characterize this amount as coinsurance.
 
 
 24
 Since the remainder following the 62 and 1/2 percent reduction is not labeled coinsurance under the statute, regulations, or Section 2470 of the Medicare Carriers Manual, HCFA believes that the States should not be required to pay this additional amount for QMBs.
 
 
 25
 According to the plaintiffs, "The new HHS policy, as adopted by ODHS, produces the anomalous result that plaintiff class members receive 37.5% less payment for treating QMBs than they receive for treating non-QMBs." They also complain that the policy "forces plaintiff class members either to bear 37.5% of the cost of providing services to QMBs or to decline to participate in the medicaid program."
 
 
 26
 In October 1995, the plaintiffs filed a class action for declaratory and injunctive relief, asserting that the new HHS policy "violates the Medicare Act, cost sharing and other provisions of the Medicaid Act, laws governing medicare and medicaid billing, and the United States Constitution." Named as defendants were Donna Shalala, as Secretary of HHS; HHS itself, the federal agency responsible for administering Medicare and Medicaid; Arnold R. Tompkins, the Director of ODHS, and ODHS, the Ohio state agency that administers Ohio's Medicaid program. The complaint included eight "claims for relief"; the first through sixth were claims that the new HHS policy was "arbitrary, capricious, and an abuse of discretion" for allegedly violating a number of Medicare and Medicaid statutory provisions. The seventh claim for relief asserted that the policy violated "Article I, section 10 of the Constitution of the United States as an impairment of the obligations of contract." Finally, the eighth claim for relief asserted that the policy violated the Fourteenth Amendment, "as a taking of property without due process of law." These latter constitutional claims are premised on the plaintiffs' statutory interpretations; if they are correct in their statutory interpretation, then they prevail on that basis, and if they are incorrect, then the constitutional claims necessarily fail as well.
 
 
 27
 Following cross-motions for summary judgment, the district court, through a magistrate judge pursuant to 28 U.S.C. § 636(c), rendered judgment in favor of the defendants, although first certifying the plaintiffs as a class of "[a]ll physicians in Ohio currently providing non-hospital treatment of mental disorders, as Medicare Part B providers, to QMBs." The propriety of that certification is not at issue in this appeal. In any event, relying largely on the reasoning of the Fourth Circuit in Maryland Psychiatric Society, Inc. v. Wasserman, 102 F.3d 717 (4th Cir.1996), cert. denied, --- U.S. ----, 118 S.Ct. 51, 139 L.Ed.2d 16 (1997), the district court concluded "that the relevant statutes cannot be read as imposing on the State of Ohio the obligation to pay the 37.5% exclusion." It rejected the plaintiffs' claim that other provisions of the Medicare Act entitled them to recover 100% of their reasonable charges in all circumstances, and noted that reading § 1396d(p)(3) as the plaintiffs suggested would make subparagraph (D) superfluous, as it would describe something that was already covered by subparagraph (B). The plaintiffs then filed this timely appeal.
 
 II.
 
 28
 When a district court's disposition of a case on cross-motions for summary judgment involves purely legal issues, our review is plenary. See Downhour v. Somani, 85 F.3d 261, 265 (6th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996). The same rules of review apply when, as here, the grant of summary judgment was premised on a question of statutory construction. See First City Bank v. National Credit Union Admin. Bd., 111 F.3d 433, 436 (6th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1162, 140 L.Ed.2d 174 (1998).
 
 III.
 A.
 
 29
 The plaintiffs argue that physicians performing Medicare services are entitled to 100% of their reasonable charge, period. They take the position that the state stands in the stead of a QMB with respect to Medicare Part B; since physicians can collect the full amount of the approved rates from non-QMBs, they should be able to do so from the state, which pays on behalf of QMBs. They point to various statutory subsections in support of this claim, contending that these subsections grant the explicit "right to collect the 20% not paid by Medicare." They contend that if they are to receive less than 100%, there must be an explicit exception to the general "rule."
 
 
 30
 Their position is, we think, unsupportable. They point to three statutory subsections, and we shall consider each in turn.
 
 
 31
 The first is 42 U.S.C. § 1395cc(a)(2)(A), which provides:
 
 
 32
 A provider of services may charge such individual or other person ... (ii) an amount equal to 20 per centum of the reasonable charges for such items and services (not in excess of 20 per centum of the amount customarily charged for such items and services by such provider) for which payment is made under part B of this subchapter .... In the case of items and services described in section 1395l(c) of this title, clause (ii) of the preceding sentence shall be applied by substituting for 20 percent the proportion which is appropriate under such section.
 
 
 33
 (Emphasis added.) As the defendants point out, the term "provider of services" is a term of art defined in the Medicare Act, and includes hospitals, nursing homes, clinics, and the likes, but does not include physicians or psychologists. See 42 U.S.C. §§ 1395x(u), 1395cc(e). Thus, section 1395cc(a)(2)(A) applies to "service providers," not physicians; further, it provides simply that a provider may charge a certain amount, not that it is guaranteed to collect that amount. And although the plaintiffs are encouraged by the fact that this provision contains a citation to § 1395l(c), the mental-disorders provision quoted above, we view that as insignificant. The fact that section 1395cc dictates that "the appropriate amount" be substituted for "20 percent" does not in any way necessarily suggest that "the appropriate amount" is 37.5%; it might just as logically be 12.5%. That is, the "appropriate amount" language could easily denote a lesser obligation to pay, not a greater obligation.
 
 
 34
 The second statutory subsection the plaintiffs ask us to consider is 42 U.S.C. § 1395w-4(a)(1), which provides:
 
 
 35
 (a) Payment based on fee schedule
 
 
 36
 (1) In general
 
 
 37
 Effective for all physicians' services ... furnished under this part during a year ... for which payment is otherwise made on the basis of a reasonable charge or on the basis of a fee schedule ..., payment under this part shall instead be based on the lesser of--
 
 
 38
 (A) the actual charge for the service, or
 
 
 39
 (B) ... the amount determined under the fee schedule established ... for services furnished during that year....
 
 
 40
 Thus, this section simply says that payment will be based on the approved rate, not that payment will be the same as the approved rate. Being paid a percentage of the approved rate is payment based on the approved rate.
 
 
 41
 Finally, the plaintiffs rely on 42 U.S.C. § 1395u(b)(3)(B), but this section applies only to contracts with insurance carriers, and has nothing to do with creating a right for physicians to be paid a certain amount.
 
 
 42
 Thus, it is clear to us that the Medicare Act gives no guarantee to the plaintiffs that they will receive 100% of their reasonable charge.B.
 
 
 43
 As we have already mentioned, the parties also disagree over the meaning of Medicare's definition of cost-sharing, which provides in pertinent part:
 
 
 44
 The term "medicare cost-sharing" means ... the following costs incurred with respect to a qualified medicare beneficiary, without regard to whether the costs incurred were for items and services for which medical assistance is otherwise available under the plan:
 
 
 45
 ....
 
 
 46
 (B) Coinsurance under subchapter XVIII of this chapter (including coinsurance described in section 1395e of this title).
 
 
 47
 ....
 
 
 48
 (D) The difference between the amount that is paid under section 1395l(a) of this title and the amount that would be paid under such section if any reference to "80 percent" therein were deemed a reference to "100 percent."
 
 
 49
 42 U.S.C. § 1396d(p)(3) (emphasis added). The plaintiffs argue that the term "coinsurance," contained in subparagraph (B), "is clearly meant to be broad." They acknowledge that coinsurance is not defined in Medicare Part B, but contend this is unimportant; Part A defines coinsurance as the amount the recipient is obligated to pay, and thus the 37.5% is coinsurance, and is an amount that the state must pick up on behalf of the QMB recipient. They contend that subparagraph (D) of the cost-sharing definition, explicitly referring to the 80%/20% division, is not rendered superfluous by their suggested reading; subparagraph (D) was apparently intended simply to "describe ... with greater particularity" this one form of coinsurance, a topic that is generally covered in (B).
 
 
 50
 The Secretary, on the other hand, contends that the QMB program was first created in 1986, at which time subparagraph (B) of the cost-sharing provision referenced only coinsurance from § 1395e, Medicare Part A, and therefore did not include the 37.5% amount. The program was amended in 1988, however, to refer to coinsurance under Medicare generally, without limiting it to § 1395e. By doing so, Congress did not intend to include the 37.5% amount as a new obligation; instead, it meant only to encompass obligations that are expressly called "coinsurance," specifically, new prescription-drug coverage under Medicare that carried corresponding beneficiary obligations expressly denominated "coinsurance." The 37.5% amount is not called "coinsurance," and thus is not covered. Finally, the plaintiffs' suggestion that "coinsurance" should mean any amount a beneficiary is obligated to pay under Medicare would render superfluous subparagraph (D), referencing the 80%/20% division, and such a reading would violate norms of statutory construction.
 
 
 51
 Before we address the substance of the parties' arguments, we must consider whether the Secretary's position is entitled to deference, or whether, as the plaintiffs contend, it is entitled to no deference because it represents a change in position.
 
 
 52
 "The starting point in interpreting a statute is its language." Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993); accord Regions Hosp. v. Shalala, 522 U.S. 448, ----, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998). "If, by 'employing traditional tools of statutory construction,' we determine that Congress' intent is clear, 'that is the end of the matter.' " Regions Hosp., 118 S.Ct. at 915 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). However, when "[c]onfronted with an ambiguous statutory provision, [the Court] generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation." Good Samaritan, 508 U.S. at 414, 113 S.Ct. 2151.
 
 
 53
 While the plaintiffs here assert, as did the petitioners in Good Samaritan, "that any deference to the agency's current position is unwarranted in light of its shifting views on the matter," id. at 416, 113 S.Ct. 2151, the Supreme Court has not taken such an uncompromising stand. Instead, the Court has held that "[t]he Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation." Id. at 417, 113 S.Ct. 2151. " '[A]n administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes.' " Id. (citation omitted).
 
 
 54
 On the other hand, the consistency of an agency's position is a factor in assessing the weight that position is due. As we have stated: "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." How much weight should be given to the agency's views in such a situation, and in particular where its shifts might have resulted from intervening and possibly erroneous judicial decisions and its current position from one of our own rulings, will depend on the facts of individual cases.
 
 
 55
 Id. (citation omitted). The Court in Good Samaritan concluded that "where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction." Id. We find it clear that the parties' dispute is not one that is explicitly addressed in the statute; thus, it follows that the Secretary's views are entitled to some deference.
 
 
 56
 We need not, however, determine with perfect certitude the extent of the appropriate deference, for we view the Secretary's interpretation of subparagraphs (B) and (D) as far more plausible than that of the plaintiffs. We find persuasive the reasoning of the Fourth Circuit in Maryland Psychiatric Society, 102 F.3d at 717, when it explained its rejection of the plaintiff's use of the "dictionary definition of coinsurance":
 
 
 57
 [I]t sweeps in too much and renders other provisions of section 1396d(p)(3) superfluous. If the term coinsurance in section 1396d(p)(3)(B) were intended to include every payment obligation shared by the federal government and a state Medicaid program, then it would certainly encompass the 20% copayment required of states under the QMB program. If that were true, Congress would not have needed to include section 1396d(p)(3)(D), which requires the states to pay the 20% copayment for QMBs. Rules of statutory construction forbid us to construe one provision in a way that renders another provision of the same enactment superfluous.
 
 
 58
 Id. at 720. Thus, if "coinsurance" included the 20% amount, then there would be no need for paragraph (D)--and contrary to the plaintiffs' assertions, it is not usual for statutes to add redundant paragraphs just to underscore the importance of a point.
 
 
 59
 In sum, the plaintiffs' argument is premised to a great degree on a flawed reading of the Medicare Act, which nowhere guarantees 100% of a physician's reasonable charge. There is, moreover, nothing elsewhere in the Medicare Act that provides support for their position.
 
 IV.
 
 60
 The judgment of the district court is AFFIRMED.
 
 
 61
 MOORE, Circuit Judge, concurring.
 
 
 62
 In its brief on appeal, ODHS raises the defense of Eleventh Amendment immunity. Because this argument implicates our jurisdiction, I would consider it despite ODHS's failure to raise it in the district court. See Wilson-Jones v. Caviness, 99 F.3d 203, 206 (6th Cir.1996), amended by 107 F.3d 358 (1997). Because state agencies generally are immune from suit in federal court, ODHS should have been dismissed from this case.
 
 
 63
 The Eleventh Amendment has been held to prohibit private citizens from suing states in federal court, except in special circumstances where Congress has abrogated immunity or a state has waived it. See Edelman v. Jordan, 415 U.S. 651, 662-63, 671-72, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This immunity extends to any entity that is an "arm of the state," because a suit against such an entity is, in effect, a suit against the state. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Mumford v. Basinski, 105 F.3d 264, 267 (6th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 298, 139 L.Ed.2d 229 (1997). Whether a particular entity is an "arm of the state" depends, in part, on its status under state law. See Mt. Healthy, 429 U.S. at 280, 97 S.Ct. 568. There is no doubt that a suit against ODHS is a suit against the state for Eleventh Amendment purposes. See Ohio Rev.Code Ann. §§ 5101.01--5101.07 (Banks-Baldwin West 1994 & Supp.1998) (establishing ODHS as a statewide agency); see also Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 152 n. 2 (6th Cir.1995) (affirming summary judgment for defendant because Eleventh Amendment bars suits "against the state and its departments"); Chambers v. Ohio Dep't of Human Serv., 145 F.3d 793, 794 (6th Cir.1998) (noting district court's dismissal, on Eleventh Amendment grounds, of ODHS from suit challenging Medicaid eligibility requirements), petition for cert. filed (U.S. Aug. 25, 1998) (No. 98-360); Davila v. Ohio Dep't of Human Serv., 106 F.3d 400, 1997 WL 41198 (6th Cir.1997) (affirming district court's dismissal of ODHS from claims for which Congress has not abrogated Eleventh Amendment immunity). Because ODHS is an arm of the state of Ohio, it must be dismissed as a defendant in this case. The other defendants, including the director of ODHS, are properly sued in federal court, and we consider the merits of the plaintiffs' claims as to them.